

COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

| | | |
|---|---|---|
| BECOME NEW INVESTMENTS, L.L.C., | § | No. 08-24-00106-CV |
| Appellant, | § | Appeal from the |
| v. | § | 98th District Court |
| ASHLEIGH EMMETT, | § | of Austin, Texas |
| Appellee. | § | (TC# D-1-GN-23-004385) |

**MEMORANDUM OPINION**

Appellee Ashleigh Emmett (Ashleigh) filed suit against Appellant Become New Investments, L.L.C. (BNI), alleging, among other things, various defects in the construction of a home in Austin that BNI built and sold to Ashleigh and her husband, Daniel Emmett (Daniel).[1] BNI filed a motion to compel arbitration, contending Ashleigh and Daniel were bound by an arbitration agreement contained in a builders warranty policy BNI purchased at the time of the sale, which contained express warranties covering the home. Ashleigh opposed the motion, arguing the warranty was not properly issued, and even if it had been, she could not be bound by the arbitration agreement contained therein because only Daniel signed the application for the

---

[1] Because some of the individuals in the opinion share the same last name, we refer to them by their first names. In doing so, we intend no disrespect.

warranty at closing. Alternatively, she maintained her claims fall outside the scope of the arbitration agreement. The trial court denied the motion, and this interlocutory appeal followed.[2]

We conclude that because the application was part of a unified instrument for the sale of the home to which Ashleigh was a party, and because the builders warranty was later issued and never cancelled by the Emmetts within the 30-day period specified in the warranty, Ashleigh is bound by the warranty's arbitration agreement. We further conclude that deciding the arbitrability of Ashleigh's claims is within the purview of the arbitrator. Therefore, we reverse and remand to the trial court to submit Ashleigh's claims to arbitration in accordance with the provisions in the Warranty.

## I. FACTUAL BACKGROUND

### A. The Emmetts sign a contract to purchase a new home from BNI

In February 2021, the Emmetts signed an agreement to purchase a home that BNI's owners, Jeffrey and Mary Mills, were in the process of building (the Sales Contract).[3] Under the Sales Contract, BNI was to "complete all improvements to the Property with due diligence in accordance with the Construction Documents[,]" which were signed by the parties and expressly incorporated by reference into the contract. Compass RE Texas, L.L.C. (Compass) was the listing broker firm and became the intermediary for the sale between the Emmetts and BNI. Compass appointed Phyllis Patek as the listing associate for BNI, and Amanda and Alex Pettitt as the selling associates for the Emmetts.

---

[2] The appeal was transferred to this Court from the Third Court of Appeals pursuant to the Texas Supreme Court docket equalization efforts. *See* Tex. Gov't Code Ann. § 73.001. We follow the precedent of that court to the extent it conflicts with our own. *See* Tex. R. App. P. 41.3.

[3] The purchase price was $3,800,000.

2

### B. BNI asks where to send the builders warranty policy

Although the Sales Contract itself did not contain any express warranties, it allowed the parties to enter into a "separate writing" containing such warranties. Specifically, under the "warranty" heading, the contract stated, "[e]xcept as expressly set forth in this contract, *a separate writing*, or provided by law, Seller makes no other express warranties"[4] (emphasis added). BNI contends that prior to the closing date, it informed the Emmetts of its intent to purchase a builders warranty policy containing express warranties covering the property, pointing to a series of emails between the parties' real estate agents. In an email dated April 6, 2021, containing the subject line "[the subject property address]-Builders Warranty Info," Mary Mills asked Patek for the "buyer's current mailing address for the Builders Warranty info." She indicated BNI had previously used the realtor's physical address and the buyers' phone and email address to communicate with them but wanted to know the buyers' preference in this instance. Patek apparently forwarded the email to Amanda and Alex Pettitt, and Alex replied: "We can use our address or even the office address if you want." Later that day, Patek sent a follow-up email to Mary Mills, stating, "Let's use the buyers['] agent office address" and provided the Emmetts' cell phone numbers.

In an email dated May 13, 2021, Mary and Jeffrey Mills informed the closing agent at the title company that they were sending a copy of a "Builders Warranty Application" along with instructions for filling out the application. The email stated that per the instructions, the buyers were to sign three copies of the application at closing, one of which was to be submitted to Centricity, the company issuing the policy, along with the enrollment fee. The Millses further stated in the email that they would bring a check written to Centricity to cover the fee. Patek was copied on the email.

---

[4] We agree with BNI that this provision in the contract *allowed* the parties to enter into a "separate writing" containing express warranties, such as a builders warranty policy.

### C. Daniel signs the builders warranty policy application at closing

At the closing on May 24, 2021, in addition to the Sales Contract, the Emmetts were presented with several other documents, including a "Warranty Coverage Application" for a builders policy to be issued by Centricity (the Warranty Application).[5] The Warranty Application described the policy as a "10 Yr Structural Warranty + 1 Yr Workmanship & Materials/2 Yr Systems Warranty." It further provided the address of the new home the Emmetts were purchasing from BNI and listed the "homeowner" as Daniel Emmett and the "co-owner" as Ashleigh Emmett. The Warranty Application specified an "enrollment fee" of $2,500.

The first page of the Warranty Application contained a line labeled "Signatures," providing: "HOMEOWNER(S): I/we acknowledge that by signing this application l/we affirm that I/we have read and understand the Important Homeowner's Acknowledgement on Page 2[.]" (the Acknowledgment). The Acknowledgement specified that if the home was enrolled in the Centricity Warranty Program, the homeowners were "accept[ing] the terms and conditions contained therein," which included an "exclusive, final and binding alternative dispute resolution processes, including but not limited to arbitration[.]" The Acknowledgement stated: "By accepting this warranty, I/we are agreeing to waive my/our right to a trial by either judge or jury in a court of law." It further stated that the "Warranty Documents" would be mailed to the homeowners, who would have 30 days to cancel the policy if they were not completely satisfied, and that the failure to do so would waive their right to assert the "inapplicability" of the Warranty's terms. The "WARRANTY MAILING INSTRUCTIONS" stated: "Mail Warranty To New Home Address Above."

---

[5] The parties signed a number of other documents during the closing, including a "Final Customer Walk-Thru Approval and Punch List," indicating the Emmetts had inspected the property and improvements and found them "fully completed pursuant to [their] contract with [BNI] and satisfactory to [them]" and "accept[ed] the Improvements and Property in their present condition" with some listed exceptions.

4

At the closing, Daniel signed the Warranty Application next to the line, "Homeowner Signature," but Ashleigh did not. Below Daniel's signature was a line for the homeowner email with Daniel's name typed in, under which it states, "This email address is where we will send your warranty documents. Please print clearly."

BNI paid the $2,500 enrollment fee and, as discussed in more detail below, Centricity thereafter issued a builders warranty policy covering the Emmetts' new home (the Centricity Warranty or Warranty). However, the parties dispute whether the Centricity Warranty was mailed to the Emmetts at their new home, whether it was sent to Daniel's email address, and/or whether the Emmetts actually received a copy of the Warranty before their attorney later requested it.

**D.    The Emmetts complain of issues with the home and retain an attorney**

After moving into the home, the Emmetts, either jointly or through Ashleigh, contacted the Millses about problems with the home on several occasions. Ashleigh contends she did so without knowledge of the Centricity Warranty, believing her claims were made under various implied warranties inherent in the Sales Contract. Dissatisfied with BNI's efforts to address the problems, the Emmetts retained attorney Jo Ann Merica, who sent a letter to the Millses on January 26, 2022, stating she was representing both Daniel and Ashleigh Emmett "in connection with apparent construction defects in the new home they purchased from [BNI] in May of 2021."

Jeffrey Mills responded by letters dated January 28, 2022, and February 4, 2022, stating he was willing to address the Emmetts' issues, but expressing concern that they had apparently begun addressing issues not previously reported to BNI. He explained that BNI could not "assume any responsibility for issues that [they] were not aware of, were not allowed to assess or address, or for any consequences that flow, directly, or indirectly, from work [they] had no input into or control over." In his February letter, he informed Merica that the Emmetts had agreed to abide by

5

Texas Property Code Chapter 27 requiring notice of construction defects prior to filing suit to give the builder the chance to address the issues. He suggested that they meet to address the Emmetts' concerns.

Merica responded in a February 7, 2022 letter telling Jeffrey Mills that a meeting would be "premature at this time," as she wished to wait until "third-party professionals have evaluated the issues with the residence and provided repair recommendations." Merica informed Mills of her intent to give BNI written notice of the problems under Texas Property Code § 27.004, adding that the Emmetts had given BNI numerous opportunities to fix the problems and it had become necessary to their health and safety that they fix the issues themselves.[6]

### E.   BNI provides a copy of the Centricity Warranty to the Emmetts' attorney

In the same letter, Merica stated, "In the meantime, I would appreciate it if you would forward a copy of the written warranty promised to the Emmetts—they are having trouble locating it." Mary Mills emailed Merica on February 9, 2022, stating she was providing "an electronic copy of the Builders Warranty for [the subject property] per the request made in your letter of Feb 7."

### F.   The Centricity Warranty terms

The Centricity Warranty on the Emmetts' home, as supplied to Merica, contained a welcome provision, stating that the Emmetts' builder "cared enough to provide limited warranty coverage" for their new home through Centricity. It listed the address of the Emmetts' newly constructed home, identified both of the Emmetts as the homeowners, and identified BNI as the builder. It further informed the Emmetts that the "warranty belongs to your property address," and

---

[6] Section 27.004(a) of the Property Code provides: "Before the 60th day preceding the date a claimant seeking from a contractor damages or other relief arising from a construction defect initiates an action, the claimant shall give written notice by certified mail, return receipt requested, to the contractor, at the contractor's last known address, specifying in reasonable detail the construction defects that are the subject of the complaint." Tex. Prop. Code Ann. § 27.004(a).

that if they were to sell the home, "the warranty document stays with the home for the new owners."

The Centricity Warranty "set[] forth a commencement date of May 17, 2021," and contained a 30-day cancellation notice in bolded font:

> **Be sure to read these documents to understand the benefits and limitations of Your warranty. You may return the warranty for cancellation within 30 days of Your receipt of it. If canceled Centricity will refund the full Warranty Enrollment Fee paid to the Builder. Cancellation of this warranty does not extend or alter the Builder's responsibilities.**

It included a one-year warranty period for workmanship and materials, a two-year warranty period for systems, and a ten-year warranty period for major structural defects, with an aggregate limit of one million dollars. It provided a detailed list of what workmanship, materials, and systems were covered as well as what would be considered major structural defects.

The Centricity Warranty specified that by accepting enrollment in the Centricity Warranty program, the homeowners agree to the method and manner of repair and/or replacement selected by the Builder or Centricity and waive all other express and implied warranties from the Builder, "including but not limited to warranties of habitability, merchantability, fitness for a particular purpose and/or good and workmanlike construction." The Warranty provided that, in the event of a defect in construction, the homeowners "must contact Your Builder as soon as possible upon your detecting a defect and before the expiration of the applicable Warranty Period." It further provided that "[t]he Builder or Centricity, if necessary, shall have the option to repair, replace or pay You the reasonable cost of repair and/or replacement of any covered defect." And the Warranty stated that in the event of a covered defect, the homeowners' "sole remedy . . . is as prescribed in the terms and conditions of the Centricity Warranty issued on the Home."

The Warranty contained detailed dispute resolution procedures culminating in binding arbitration:

> In the event any Dispute under any Centricity warranty, including without limitation, a claim of subrogation, negligent or intentional misrepresentation or nondisclosure in the inducement, breach of any alleged duty of good faith and fair dealing, and/or any dispute over the scope of this Arbitration Provision, cannot be resolved by one of the Alternative Dispute Resolution processes described herein, You, the Builder and Centricity agree to submit the Dispute to binding arbitration. You will have the right to select the arbitration company from the list of approved arbitration companies Centricity will provide to You when arbitration is requested. The arbitration will be conducted under the arbitration company's rules in effect at the time of the arbitration.

> The decision of the arbitrator shall be final and binding on all parties and may be entered as a judgment in any State or Federal court of competent jurisdiction. **By accepting the warranty, You are agreeing to waive Your right to a trial by either judge or jury in a court of law.**

**G.    The Emmetts' attorney gives BNI notice under the Property Code**

On May 5, 2022, almost three months after Mary Mills emailed Merica a copy of the Warranty, Merica sent a letter by certified mail to Jeffrey and Mary Mills, again stating that she had been retained by both Ashleigh and Daniel Emmett with respect to the construction defects on the home they had purchased from BNI. The letter contained the subject line, "NOTICE PURSUANT TO TEXAS PROPERTY CODE § 27.004; [subject property]," and stated, "Please let this letter serve as written notice of the construction defects and costs incurred to date in connection with the residence[.]" Merica chronicled the issues the Emmetts claimed they had faced since purchasing the home and attached "Exhibit A," which "details additional items of defective construction that have become evident in the Emmetts' one year warranty period. Exhibit A and the reports[] specify the construction defects that are the subject of my clients' complaints, as required by Tex. Prop. Code § 27.004(a)."

## H. BNI addresses the applicability of the Centricity Warranty

On September 15, 2022, Jeffrey Mills sent Merica a letter with the subject line containing the Emmetts' address, followed by: "Centricity Warranty Agreement and August 18, 2022 Offer Clarification." In the letter, Jeffrey informed Merica that the Emmetts' claims "are subject to and governed by the Centricity Warranty Agreement," asserting it is the "sole remedy . . . in the event of a defect in Your Home or in the real property upon which it is situated." Jeffrey indicated he had been in contact with Centricity concerning the Emmetts' claims and believed the Emmetts' claims all fell within the scope of the Warranty. He nevertheless referenced an offer that BNI had previously made to settle the Emmetts' claims and stated he was willing to extend its settlement offer until September 19, 2022. However, he warned that if the offer was not accepted, BNI would proceed in accordance with the terms of the Centricity Warranty in addressing any requested repairs.

## I. Merica acknowledges receiving the Centricity Warranty but denies its applicability

In a September 18, 2022 letter to Jeffrey Mills, Merica stated she was responding to his claim that the Emmetts had waived their right to bring a claim for damages based on the "boilerplate language" in the Centricity Warranty, maintaining the Warranty was "never furnished to my clients" or mentioned in any of their agreements. Merica explained that after requesting a copy of the Warranty in February 2022, she "confirmed that [the Warranty] had never been received by [her] clients' realtor." Merica asserted there was therefore "no effective waiver of any right to litigate this matter or the implied warranty of good and workmanlike construction," and "the failure to disclose these limitations and waivers in a purported Builder's Warranty constitutes a deceptive trade practice."

9

Merica went on to accept certain terms in BNI's settlement offer but reject others, contending certain repairs had been satisfactorily made while others had not. She attached an exhibit chronicling the various issues that the Emmetts believed still needed to be addressed.

### J. Centricity provides evidence that it emailed the Centricity Warranty to Daniel in June 2021

After Merica informed BNI that her clients had never received the Centricity Warranty, Mary Mills apparently contacted Centricity to inquire whether the Warranty had been sent to them. Sue Maas, a Centricity employee, responded in a September 19, 2022 email stating that Centricity provides documents to a homeowner via email unless an email is not provided. Maas explained that Centricity "record[s] when a warranty document is sent to a new homebuyer in our system . . . [and] records if the email [was] sent successfully." According to Maas, the "mailing instruction" on the application indicating that the Warranty would be sent to the buyers' home address is "simply to confirm the owner's physical mailing address in the event we do not receive email information." Maas provided documentation from Centricity's system demonstrating that on June 9, 2021, the Warranty documents were successfully sent to Daniel's email address as provided on the homeowners' application.

### K. Jeffrey Mills raises the arbitration agreement in the Centricity Warranty

Jeffrey Mills wrote to Merica on September 26, 2022, asserting the Warranty was "clearly a binding agreement" and stating he was "surprised" the Emmetts were "attempting to disavow it." He maintained BNI had paid for the Centricity Warranty prior to closing, and the Warranty Application, which he attached to his letter, was signed at closing. Jeffrey stated that BNI had confirmed with the warranty company that the Emmetts were "enrolled" in its program, and that on June 19, 2021, the Warranty had been sent to Daniel via email at the address provided in his application. He also noted that Merica was given a copy of the Centricity Warranty in February

2022, and despite the cancellation provision, neither Merica nor the Emmetts attempted to cancel within 30 days of receipt. Finally, Jeffrey pointed out that the Centricity Warranty contained an arbitration provision which waived the right to bring a judicial proceeding.

## II. PROCEDURAL BACKGROUND

### A. Ashleigh files her lawsuit

On August 14, 2023, Ashleigh, represented by Merica, filed suit against BNI, complaining that immediately upon moving into the home, "problems with the construction of the house became apparent." Ashleigh listed several alleged construction defects, many of which involved water leaks leading to mold making the home uninhabitable and "unsuitable for its intended use as a home."[7] According to Ashleigh, BNI attempted to fix the alleged defects on various occasions, but they were not properly repaired.

Ashleigh claimed BNI "misrepresented the quality, condition and suitability and fitness of the Residence," and it "was not built in accordance with all applicable plans, specifications, design professionals' recommendations, manufacturer's installation instructions, building codes, and industry standards, was not built in a good and workmanlike manner, was not free from defects and was not suited for its intended use." Ashleigh listed several causes of action, including negligence, claiming BNI was negligent both in constructing the home and in making requested repairs; breach of contract, claiming BNI failed to construct the home in accordance with the construction documents to which the parties had agreed; and breach of the implied warranties that the home was of "habitable quality," that it was "built in a good and workmanlike manner," that

---

[7] Ashleigh claimed, among other things, that there were drainage issues between the pool and the house, which caused water to flow onto their porch; "defective sealing of the roof vent," which caused leakage into the home when it rained; the home was "subject to water penetration through numerous avenues due to defects in construction" causing mold issues in the home; the house had "severe settlement" issues; there was "improper backfill and subgrade compaction affecting drainage [and a] lack of proper sloping grade away from the foundation"; there were problems with the septic system; the garage door had structural issues that caused it to sag; and stucco was improperly installed.

11

repairs would be performed in a good and workmanlike manner, and that construction would be "adequately supervised."

Ashleigh also sought a declaratory judgment that she had "not waived any implied warranties" and was not subject to the "limitations of the Centricity Warranty," as she did not sign the application for the Warranty. In addition, she asserted that "the terms of the Centricity warranty were not disclosed to Daniel or Ashleigh Emmett at or prior to closing." She further alleged that "[t]he application for warranty expressly provided that the warranty would later be mailed to the address of the insured property," but "[i]t never was."

Finally, Ashleigh alleged BNI violated the Deceptive Trade Practices Act (the DTPA) by failing to disclose the terms of the Warranty, by misrepresenting that it had complied with the terms of the construction contract, and by its various breaches.

In addition to her request for a declaratory judgment, Ashleigh sought money damages and attorney's fees.

### B. BNI moves to compel arbitration

In September 2023, BNI filed a response in which it denied Ashleigh's allegations and further alleged that her claims were subject to arbitration. BNI then filed a motion to compel arbitration, contending the Centricity Warranty required the homeowners to submit any disputes between them, the builder, and Centricity to binding arbitration. BNI adamantly disagreed with Ashleigh's position that she was not subject to the Centricity Warranty and attached an affidavit from Jeffrey Mills, together with numerous exhibits in support of its contention.

### (1) Affidavit of Jeffrey Mills

In his affidavit, Jeffrey Mills recalled that after the closing, the Emmetts had several complaints, which BNI addressed. He asserted that at some point, the Emmetts' attorney became

their "primary conduit for communication," and Mills provided her with a copy of the Centricity Warranty in February 2022. Thereafter, he averred, the Emmetts, through their attorney, continued to "request repairs and other minor work during the one-year warranty period, which BNI continued to address." He further averred that no one informed BNI that the Emmetts had taken any steps to cancel the Centricity Warranty. And he asserted that upon inquiry, a Centricity employee had informed BNI in August 2022 that the Emmetts were enrolled in the Warranty program, as they had not cancelled it.

Jeffrey attested to several exhibits in his affidavit, including the Sales Contract; various change orders requested by Ashleigh and/or Daniel prior to closing; the April 6, 2021 email exchange between Mary Mills and Patek regarding where to send the Warranty; a copy of the $2,500 check BNI paid to Centricity to enroll the Emmetts in the Warranty program; the Warranty Application signed by Daniel; the Centricity Warranty itself; the September 19, 2022 email exchange between Mary Mills and Sue Maas in which Maas informed Mary that the Centricity Warranty had been emailed to Daniel; and correspondence between Jeffrey Mills and Merica.

### (2) BNI's theories for binding Ashleigh to the arbitration agreement as a nonsignatory

In its motion, BNI alleged the following theories upon which Ashleigh was bound to the arbitration agreement despite her failure to sign the Warranty Application:

- Ashleigh could be considered a party to the arbitration agreement, given her signature on the Sales Contract, asserting that the Sales Contract and Warranty Application constitute a single, unified instrument;

- Ashleigh was bound to the arbitration agreement by the doctrine of incorporation by reference;

- Ashleigh was bound to the agreement by the doctrine of direct benefits estoppel; and

- Ashleigh was bound as a third-party beneficiary to the agreement.

13

BNI further maintained that Ashleigh's claims fell within the scope of the agreement, contending the arbitration agreement covered "all disputes between the parties having a significant relationship to the contract regardless of the label attached to the dispute." According to BNI, all of Ashleigh's claims, regardless of their labels, centered on alleged construction defects or workmanship issues covered by the Centricity Warranty.

### C. Ashleigh responds to the motion to compel arbitration

In her response to the motion to compel arbitration, Ashleigh denied the existence of a valid arbitration agreement, contending the application Daniel signed at closing was "conditional" and only provided that the homeowners would be subject to the arbitration provision if the home was enrolled in the Centricity Warranty Program. Ashleigh argued the home was not properly enrolled in the program, as the application itself stated that certain conditions precedent had to be met before the home would be enrolled—such as requiring that all blanks must be filled in—which she maintained did not happen because Ashleigh did not fill in a blank with her signature. She further argued that the Centricity Warranty had to be mailed to the homeowners before it could take effect, and she claims it was never mailed. Ashleigh reasoned that if the Warranty never became effective, neither did the arbitration agreement.

Ashleigh further asserted that even if the Warranty's arbitration provision were valid, she was not bound by it, as she never signed the application for the Warranty, its terms were not disclosed to her or Daniel prior to closing, and they were never given a copy of the Warranty either before or after the closing.[8] Ashleigh also expressly denied that she could be bound as a nonsignatory under the Warranty under any theory raised by BNI. Finally, she argued that her

---

[8] Ashleigh did not contend that BNI, which paid $2,500 for the Warranty, failed to provide sufficient consideration for its issuance.

claims, which included negligence, breach of contract, breach of implied warranties, and violation of the DTPA, did not fall within the scope of the arbitration provision.

### (1) Ashleigh's unsworn declaration

In an unsworn declaration in support of her response, Ashleigh acknowledged she was present at closing and Daniel signed the Warranty Application at closing, but she claimed she did not see a copy of the Warranty Application until "it was attached to correspondence sent to [their] attorney by Jeff Mills on September 26, 2022." Ashleigh averred that she and Daniel were not given a "sample" copy of the Centricity Warranty before or at closing, and that "[n]o final issued Centricity warranty was ever delivered or received by mail at [the subject home]." She therefore claimed that they had no opportunity to cancel within the requisite 30-day period.

Ashleigh asserted that before hiring an attorney, she communicated about the construction issues with Mary Mills, who never mentioned the Centricity Warranty. Ashleigh said she believed she was requesting repairs under implied warranties that she assumed came with the home. Ashleigh recalled that in February 2022, when her attorney asked her if there was a "written warranty issued on the house[,]" she looked through her documents and was unable to locate one. She stated she called Amanda Pettitt, and Pettitt informed her that she had "received an e-mail before closing mentioning 'builder warranty information' but had never received anything along those lines." According to Ashleigh, despite all of the correspondence between Merica and Jeffrey Mills, BNI did not refer to the Centricity Warranty until September 2022, and she had not been aware until then of BNI's position that the Warranty applied to the repair requests. She concluded by averring that she never "accepted" the terms of the Centricity Warranty and did not want the "supposed benefits of the Centricity Warranty for our $3,800,000 home."

15

### (2) Merica's unsworn declaration

Merica also provided an unsworn declaration in which she stated that she began communicating with BNI, through Jeffrey Mills, on January 26, 2022, but despite their lengthy communications, "[a]t no time prior to the letter of September 15, 2024 [sic] . . . did BNI communicate that it considered the Emmett's [sic] claims to be subject to and governed by the Centricity Warranty Agreement."[9] According to Merica, "BNI also did not suggest that furnishing an electronic copy of the warranty to [her] in February of 2022 triggered the beginning of a 30-day cancellation period for the Emmetts."

### (3) Amanda Pettitt's unsworn declaration

Amanda Pettitt provided an unsworn declaration stating that she was one of the Compass realtors who represented the Emmetts in the purchase. She recalled Ashleigh contacting her in February 2022 asking if she had a copy of a builders warranty, whereupon she searched her records but could not find any such copy. According to Pettitt, "No other documents were delivered to [her], in any manner, at any place or time concerning a builder's warranty on [the subject property]."

### (4) Alex Pettitt's unsworn declaration

Alex Pettitt provided an unsworn declaration in which he stated that he was also one of the Compass realtors who represented the Emmetts in the purchase. Regarding the Warranty documents, he stated:

> No documents were delivered to me, in any manner, at any place or time concerning information about a builder's warranty on the [subject] property except for an e-mail in April 2021 requesting an address where information could be sent. No documents concerning a builder's warranty on the [subject] property were ever delivered by me to Ashleigh or Daniel Emmett.

---

[9] Although Merica refers to the parties' letters as dated 2024, the record reflects that they were all dated 2022.

### (5) Daniel's unsworn declaration

Finally, Daniel Emmett provided an unsworn declaration stating he was "not given any proposed terms of an express warranty on our home or any sample warranty before or at closing." He asserted he had "no recollection of receiving an e-mail after closing containing a home warranty" and "know[s]" he "did not open such an e-mail or print or view any warranty documents."

Daniel stated that after being notified in September 2022 that the Warranty had been emailed to him on June 19, 2021, he searched his emails and found no record that the Warranty was sent to him on that date, adding that it may have gone to his spam folder, which he deleted regularly. He further asserted that he "never received a mailed copy of final warranty documents at [his] home address."

### D. BNI's supplement

In a supplement to its motion to compel arbitration, BNI provided a second affidavit from Jeffrey Mills, in which he averred, "Before closing, I personally informed Alex Pettitt that the property was being sold with a 1-2-10 express builder's warranty." Prior to closing, he further averred, Mary Mills also informed Alex—who he pointed out was an experienced builder himself—that BNI would be issuing a builders warranty on the property, but neither the Pettitts nor the Emmetts requested a copy. Jeffrey noted that the title company was furnished with the Warranty Application prior to closing with instructions for both buyers to sign the application. He further noted that because BNI closed first, he was unaware Ashleigh had not signed the application, but claimed that had he known, BNI would not have closed.

17

### E. Ashleigh's supplement

Ashleigh thereafter provided her own supplement in opposition to the motion, which included another affidavit from Alex Pettitt, averring that while representing the Emmetts, he spoke very briefly with Jeffrey and Mary Mills on a few occasions prior to closing. However, Alex claimed neither of them informed him that a Warranty was being issued for the property and again asserted "[n]o documents were delivered to [him], in any manner, at any place or time concerning the terms of an express builder's warranty on the [subject] property."

### F. The trial court's ruling

Following a non-evidentiary hearing, the trial court denied BNI's motion to compel arbitration without specifying its reasons. Neither party requested findings of fact or conclusions of law. BNI appealed, and this Court stayed the trial court proceedings pending appeal.

## III. ISSUES ON APPEAL

Although not raised as a separate issue on appeal, BNI contends "a valid arbitration agreement exists," as the Centricity Warranty containing the arbitration provisions was properly issued and effective regardless of whether Ashleigh signed the application or whether Centricity mailed the Warranty to the home. And BNI argues that Ashleigh is bound to the arbitration agreement despite her failure to sign the Warranty Application based on four separate theories, raised as four separate issues: (1) the application was part of a "unified transaction entered for the same purpose—BNI's sale and the Emmetts' purchase of the home[,]" and Ashleigh's signature on the sales contract was sufficient; (2) the doctrine of "incorporation by reference," as the Sales Contract made reference to the Warranty when it provided that "[e]xcept as expressly set forth in this contract, a separate writing, or provided by law, Seller makes no other express warranties"; (3) the doctrine of direct benefits estoppel, based on Ashleigh's seeking and accepting benefits of

18

both the Sales Contract and the Warranty; and (4) Ashleigh was a third-party beneficiary to the Warranty. BNI further maintains that all of Ashleigh's claims fall within the scope of the arbitration agreement, or alternatively, "the arbitration agreement clearly and unmistakably delegates disputes as to the scope of the arbitration provisions to the arbitrator."

## IV. WHETHER THE CENTRICITY WARRANTY WAS EFFECTIVELY ISSUED

We first address the question of whether a valid arbitration agreement exists that could bind either of the Emmetts.

### A. Applicable law and standard of review

Arbitration is a contractual proceeding by which the parties, in order to obtain a speedy and inexpensive final disposition of disputed matters, consent to submit the controversy to arbitrators for resolution. *See In re Phelps Dodge Magnet Wire Co.*, 225 S.W.3d 599, 605 (Tex. App.—El Paso 2005, no pet.) (citing *Jack B. Anglin Co. v. Tipps*, 842 S.W.2d 266, 268 (Tex. 1992)). A party seeking to compel arbitration must prove that (1) a valid and enforceable arbitration agreement exists, and (2) the claims raised fall within the agreement's scope. *Baby Dolls Topless Saloons, Inc. v. Sotero*, 642 S.W.3d 583, 585–86 (Tex. 2022) (per curiam). If the party seeking arbitration meets its two-pronged burden to establish the agreement's validity and scope, the burden shifts to the party opposing arbitration to raise a valid defense to the agreement's enforcement; absent evidence supporting such a defense, the trial court must compel arbitration. *J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 227–28 (Tex. 2003). Stated otherwise, if the moving party establishes these two requirements and the non-moving party fails to present evidence of a valid defense to the agreement's enforcement, it is error for the trial court to deny the motion. *See GSC Wholesale, LLC v. Young*, 654 S.W.3d 558, 563 (Tex. App.—Houston [14th Dist.] 2022, pet. denied) (citing *In re Poly-America, L.P.*, 262 S.W.3d 337, 354 (Tex. 2008)).

When contesting whether a valid arbitration agreement exists within a broader contract, "[a] party can challenge (1) the validity of the contract as a whole, (2) the validity of the arbitration provision specifically, and (3) whether an agreement exists at all." *Sotero*, 642 S.W.3d at 586 (citing *RSL Funding, LLC v. Newsome*, 569 S.W.3d 116, 124 (Tex. 2018)). Because an arbitration provision is severable from a contract, "a challenge to the larger contract's validity—the first type above—is determined by the arbitrator." *Id.* "The second type of challenge—to the validity of the arbitration provision specifically—is for the court to decide unless clearly and unmistakably delegated to the arbitrator." *Id.* (citing *Robinson v. Home Owners Mgmt. Enters.*, 590 S.W.3d 518, 525 (Tex. 2019)). "Challenges of the third type—that the contract 'never came into being'—are decided by the court." *Id.* (citing *RSL Funding*, 569 S.W.3d at 124).

Because arbitration is a creature of contract between consenting parties, a court must determine whether an enforceable agreement to arbitrate exists by applying principles of state contract law. *See In re Kellogg Brown & Root, Inc.*, 166 S.W.3d 732, 738 (Tex. 2005) (orig. proceeding) ("Under the FAA, ordinary principles of state contract law determine whether there is a valid agreement to arbitrate."); *Jody James Farms, JV v. Altman Group, Inc.*, 547 S.W.3d 624, 629 (Tex. 2018) (recognizing that "[a]rbitration is a creature of contract between consenting parties"). Thus, the party attempting to compel arbitration must show that the arbitration agreement meets all requisite contract elements. *J.M. Davidson, Inc.*, 128 S.W.3d at 228; *see also In re Palm Harbor Homes, Inc.*, 195 S.W.3d 672, 676 (Tex. 2006) (orig. proceeding) (recognizing that in determining the validity of arbitration agreements subject to the FAA, we apply ordinary state law contract principles that govern the formation of contracts).

A trial court's determination regarding the validity and scope of an arbitration agreement are questions of law that we review de novo. *In re Labatt Food Serv.*, *L.P.*, 279 S.W.3d 640, 643

(Tex. 2009) (orig. proceeding) (recognizing that a trial court's determination as to whether a valid arbitration agreement exists and whether the claims fall within the scope of an arbitration agreement are legal determinations subject to de novo review). When a trial court does not state the basis for its decision to deny a motion to compel arbitration, "we must uphold the trial court's ruling on any legal theory supported by the evidence." *In Estate of Guerrero*, 465 S.W.3d 693, 701 (Tex. App.—Houston [14th Dist.] 2015, pet. denied) (citing *Worford v. Stamper*, 801 S.W.2d 108, 109 (Tex. 1990); *Inland Sea, Inc. v. Castro*, 420 S.W.3d 55, 57–59 (Tex. App.—El Paso 2012, pet. denied) (affirming denial of motion to compel arbitration on alternative ground where order did not specify the basis for the ruling)).

## B. Analysis

On appeal, Ashleigh renews her argument that a valid arbitration agreement does not exist because the Warranty containing the arbitration agreement never came into existence, asserting that two conditions precedent set forth in the Warranty Application were never satisfied. *See generally Allstate Ins. Co. v. Irwin*, 627 S.W.3d 263, 270 (Tex. 2021) (recognizing that "[a] condition precedent may be either a condition to the formation of a contract or to an obligation to perform an existing agreement"). Ashleigh maintains that (1) the application provided that all blanks in the application were to be filled out, and (2) the Warranty was to be mailed to the Emmetts' home. Ashleigh contends neither condition was satisfied, therefore, the Warranty was not properly issued, and by extension, the arbitration agreement therein "never became effective."

We treat this as a question of law and address Ashleigh's arguments separately to determine whether the Warranty did in fact become "effective." *See Sotero*, 642 S.W.3d at 586 (recognizing that question of whether a contract containing an arbitration agreement "exists at all" is a question of law for the court to decide).

21

### (1) Failure to fill in blanks on the application

Because the application Daniel signed contained the following provision in bolded font making it clear that the application was not the Warranty itself, Ashleigh argues, she had to sign the application, i.e., fill in the blank signature line and fill in all the blanks for the Warranty to properly issue and come into effect:

> **This application is to enroll your new home in Centricity express limited warranty coverage: IT IS NOT YOUR NEW HOME WARRANTY nor is it a substitute for your homeowners insurance. Unless all blanks are completed, the application is signed, and the warranty fee is paid, your home will not be enrolled.**

As BNI points out, however, there are at least two reasons why this argument fails. First, the requirement that the parties must sign the agreement and fill in all blank lines is a condition precedent that, if not met, would have allowed Centricity to refuse to issue the Warranty, but did not give the Emmetts the right to claim that the Warranty, once issued, did not become effective. And second, as set forth above, Centricity did in fact issue the Warranty in May 2021.

Our sister court in Houston was faced with a similar scenario in which a married couple was seeking to avoid the application of a builders warranty policy, where the wife had signed an application for the warranty on the home prior to the couple's marriage. *In re Hill*, No. 01-02-00186-CV, 2002 WL 1165032, at *2 (Tex. App.—Houston [1st Dist.] May 30, 2002, orig. proceeding). As in the case before us, the warranty application in *Hill* provided that if the application was not completely filled out, "the warranty was invalid." *Id.* The warranty company issued the policy, but after discovering defects in the subject home and wishing to sue the builder for claims outside the scope of the warranty, the couple argued the warranty could not be imposed on them because several blanks were left unfilled in the application, including the box indicating that the signatory had read and understood the terms of the warranty. *Id.* The Houston court

rejected their argument, explaining that the applicant "was required to complete and submit the warranty application form . . . for the benefit of [the warranty company] who would be bound by the warranty, because the application provided [the warranty company] with information about the subject of the warranty." *Id.* In other words, the court concluded that "the right to invalidate the warranty for lack of completeness belonged to [the warranty company], not to [the buyer]."[10] *Id.*

In the present case, too, the Warranty Application gave Centricity the right to refuse to enroll the home in its program if it there were blanks in the application or missing signatures. But Centricity chose to accept and approve the application, and further accepted BNI's payment of the necessary fee, which was never refunded. We therefore agree with BNI that despite the blanks and Ashleigh's failure to sign the application, the home was properly enrolled in the Warranty program.

As discussed in more detail below, at that point, the Emmetts had the right to cancel the Warranty within 30 days of receipt of the Warranty documents if they did not wish to retain it.

### (2)  Failure to mail the Warranty documents to the Emmetts' home

Ashleigh, however, contends Centricity did not follow the correct steps to provide her and Daniel with a copy of the Warranty documents after their home was enrolled in the program, and the Warranty therefore never became effective. Ashleigh points out that the Warranty Application provided that after enrollment in the program, Centricity was to mail the Warranty documents to the Emmetts' home. Ashleigh argues that even though the record reflects that the Warranty was emailed to Daniel in June 2021 and was later emailed to Ashleigh and Daniel's attorney in

---

[10] The dissent contends that *Hill* is inapposite as in that case, the wife—unlike Ashleigh—signed the warranty application, while leaving other portions of the application blank. But the opinion in *Hill* is applicable to the point at issue, as the holding provides that it was "the applicant, who was required to complete and submit the warranty application form," and that "[t]his requirement was for the benefit" of the warranty company. *In re Hill*, No. 01-02-00186-CV, 2002 WL 1165032, at *2 (Tex. App.—Houston [1st Dist.] May 30, 2002, orig. proceeding). The court therefore recognized that "the right to invalidate the warranty for lack of completeness belonged to [the warranty company] not to [the wife]." *Id.* As in *Hill*, it was Centricity's right to reject the application, and not the Emmetts'.

23

February 2022, because the mailing condition in the Warranty Application was not satisfied, the Warranty was not validly issued. According to Ashleigh, "[u]nder the plain language of this document, *only if the applicant did not cancel the warranty within the 30 days after receiving it in the mail* would an agreement to the terms and conditions (including the arbitration provision) be formed." We disagree.

As a preliminary matter, Ashleigh's argument does not require us to determine what would occur if the Emmetts had never received a copy of the Warranty and were thereby deprived of any opportunity to review its terms and cancel within 30 days of receipt. Instead, we must only decide whether mailing the Warranty to the Emmetts' home address—as opposed to sending it via email—was a condition precedent to its validity and enforceability. We conclude that it was not.

The application's "Warranty Mailing Instructions," which provided that the Warranty was to be mailed to the buyers' "New Home Address," did not make mailing the Warranty through the U.S. mail a condition precedent to the Warranty's issuance or enforceability. The Warranty Application also contained a provision indicating that the Warranty would be sent to the buyer's email address, as provided. In addition, although the acknowledgment stated that Centricity would only "mail" the Warranty documents if it agreed to enroll the homeowner, the relevant part of the acknowledgment provided that the homeowners understood that "upon receipt of the final warranty documents," they would have "30 days to review the warranty terms and conditions and return it for cancellation if not completely satisfied." Thus, regardless of how the Emmetts *received* the Warranty documents, the acknowledgment contemplated that the Warranty would be enforceable if they received the documents and did not cancel the Warranty within 30 days.

As set forth above, the record contains documentation that Centricity sent the Warranty in June 2021 to the email address Daniel provided at closing. But even if the trial court believed

24

Daniel did not receive the Warranty at that time, the record contains undisputed evidence that the Emmetts' attorney requested and received the Warranty documents in February 2022. As discussed in more detail below because an attorney-client relationship is an agency relationship, we find Merica's receipt of the warranty documents sufficient to constitute receipt to her clients. *See Nathan A. Watson Co. v. Employers Mut. Cas. Co.*, 218 S.W.3d 797, 802 (Tex. App.—Fort Worth 2007, no pet.) (citing *Gavenda v. Strata Energy, Inc.*, 705 S.W.2d 690, 693 (Tex. 1986) (because an attorney-client relationship is an agency relationship, an "attorney's acts and omissions within the scope of his or her employment are regarded as the client's acts")). As such, the Emmetts had 30 days thereafter to cancel the Warranty. Nothing in the record suggests that the Emmetts or their attorney made any attempt to do so until September 2022, when Merica informed BNI (but not Centricity) that she believed her clients could make claims outside the scope of the Warranty.[11]

In sum, we conclude that the Centricity Warranty was properly issued and was not timely cancelled. In turn, we conclude that the arbitration provision is valid and enforceable.[12]

---

[11] Despite acknowledging that she received the Centricity Warranty in February 2022, Merica asserted in her affidavit that BNI did not inform her at that time that "furnishing the electronic copy of the warranty triggered the beginning of a 30-day cancellation period for the Emmetts." As set forth above, however, both the Acknowledgment Daniel signed and the Warranty itself made it clear that the homeowners' failure to cancel the warranty within 30 days of receipt would be considered an acceptance by the homebuyers. Accordingly, BNI's failure to alert Merica to the need to cancel the Warranty has no impact on our analysis.

[12] The dissent appears to believe that the arbitration agreement could not be enforced against either of the Emmetts because neither Daniel nor Ashleigh were put on notice of the arbitration provision's terms, as they were not given a copy of the Warranty itself at closing. We agree that a party ordinarily cannot be bound by an arbitration agreement in a contract unless she is given notice of the terms of the agreement at the time of the contract's formation. *See A-1 Freeman Moving & Storage LLC v. Ortiz Galindo*, No. 08-23-00001-CV, 2023 WL 5486236, at *5 (Tex. App.—El Paso Aug. 23, 2023, no pet.) (mem. op.) (recognizing that employee cannot be bound by an arbitration agreement absent evidence that she was given notice of the agreement and assented to its terms). However, we do not believe BNI was required to give the Emmetts a copy of the actual Warranty documents themselves or their terms at the time they executed the Sales Contract in order to satisfy the notice requirement. It is well-established that a party may be put on notice of an arbitration agreement contained in a contract if he is given an adequate "summary" of the agreement's terms. *Id*. at *5–6 (citing *In re Halliburton Co.*, 80 S.W.3d 566, 569 (Tex. 2002) (orig. proceeding) (concluding that the requirement that an employer provide an employee with "unequivocal notice of the terms of the arbitration agreement and its mandatory nature" can be accomplished by providing a "summary of the agreement to arbitrate.")). Here, the Acknowledgement section in the Warranty Application provided such a summary. Specifically, it stated that the Warranty to be issued included "exclusive, final and binding alternative dispute resolution processes, including but not limited to arbitration," and that by accepting the Warranty, "I/we are agreeing to waive my/our right

25

Accordingly, Ashleigh's argument that the Centricity Warranty was never properly issued could not have served as a basis for the trial court's decision to deny BNI's motion to compel arbitration.

## V. WHETHER ASHLEIGH CAN BE CONSIDERED A PARTY TO THE ARBITRATION AGREEMENT DESPITE HER FAILURE TO SIGN THE WARRANTY APPLICATION

Having found that the Centricity Warranty was properly issued and was never cancelled, we next consider BNI's argument that Ashleigh can be considered a party to the Warranty, even though only Daniel signed the Warranty Application, under the theory that the Warranty Application and the Sales Contract must be construed as a unified instrument. Although not raised as a separate issue, we also consider BNI's argument that Ashleigh can be considered a party to the arbitration agreement contained in the Centricity Warranty based on her conduct demonstrating assent to be bound by the terms of the Warranty.

### A. Applicable law

The "uniform instrument" theory provides that when appropriate, "a court may determine, as a matter of law, that multiple separate contracts, documents, and agreements were part of a single, unified instrument." *Rieder v. Woods*, 603 S.W.3d 86, 94–95 (Tex. 2020) (internal quotation marks omitted). As the Texas Supreme Court has explained, "[i]n determining whether multiple agreements are part and parcel of a unified instrument, a court may consider whether each written agreement and instrument was 'a necessary part of the same transaction.'" *Id.* (citing *Bd. of Ins. Comm'rs v. Great S. Life Ins. Co.*, 239 S.W.2d 803, 809 (Tex. 1951)). Thus, "[t]he general rule is that separate instruments or contracts executed at the same time, for the same purpose, and in the course of the same transaction are to be considered as one instrument, and are to be read and

---

to a trial by either judge or jury in a court of law." We find this to be a sufficient "summary" of the arbitration's terms so as to put the Emmetts on notice that they were agreeing to binding arbitration at the time they entered into the Sales Contract.

26

construed together." *Rieder*, 603 S.W.3d at 94, n.35 (quoting *Jones v. Kelley*, 614 S.W.2d 95, 98 (Tex. 1981)). Even if parties "execute[] the instruments at different times and the instruments do not expressly refer to each other," if they nevertheless pertain to the same transaction, courts may still construe the documents together "as if they were part of a single, unified instrument." *Fort Worth Indep. Sch. Dist*, 22 S.W.3d at 840; *In re Laibe Corp.*, 307 S.W.3d 314, 317 (Tex. 2010) (orig. proceeding) (recognizing same). However, the Texas Supreme Court has cautioned that when "construing multiple documents together, courts must do so with caution, bearing in mind that tethering documents to each other is 'simply a device for ascertaining and giving effect to the intention of the parties and cannot be applied arbitrarily and without regard to the realities of the situation.'" *Rieder*, 603 S.W.3d at 94–95 (quoting *Miles v. Martin*, 321 S.W.2d 62, 65 (Tex. 1959)).

### B. The Warranty Application was part of the same transaction as the parties' Sales Contract

As BNI points out, our sister court has applied this concept to a situation in which the parties executed multiple documents at the closing of a home purchase, finding that the various documents were part of the same transaction and therefore could properly be construed together as a singled unified instrument. *See Christerson v. Speer,* No. 01-16-00469-CV, 2017 WL 1520449, at *5, n.2 (Tex. App.—Houston [1st Dist.] Apr. 27, 2017, pet. denied) (mem. op.) (citing *Fort Worth Indep. Sch. Dist.*, 22 S.W.3d at 840) (concluding that the various documents executed by the parties at closing could be construed together as a single unified instrument to determine the parties' obligations); *see also Famous Water Co., L.P. v. Aquio Sols. Intermediate Holdings, LLC*, No. 02-23-00329-CV, 2024 WL 2971686, at *10–11 (Tex. App.—Fort Worth June 13, 2024, no pet.) (mem. op.) (construing various documents executed by the parties at different times as a single, unified instrument, where they all related to the same transaction and were entered for the

purpose of consummating the sale of the subject property). BNI contends the parties intended for the Warranty Application and the Sales Contract to be executed at the same time, as part of the same transaction, and we should similarly conclude that the parties intended for them to be construed together as part of a single, unified instrument. We agree.

First, the parties' conduct and that of their real estate agents prior to and at closing demonstrate an intent that the Warranty Application be executed as part of the sales transaction. As set forth above, prior to closing, the real estate agents representing both parties discussed where to send the builders warranty information. Although the Emmetts' agents denied ever seeing the Warranty itself, they did not, and could not, deny they were aware that a builders warranty was contemplated as part of the sale transaction. In addition, the record contains the email Mary Mills sent the title agent, with a copy to the Millses' real estate agent, that had directions to provide the Warranty Application to the Emmetts at closing. It stated they would bring a check for the Warranty Application with them to closing. The record further contains undisputed evidence that the Millses brought the check with them to closing and Daniel signed the Warranty Application.

Moreover, contrary to Ashleigh's argument, we find nothing in the parties' Sales Contract and the Warranty Application which would preclude a finding that the Warranty Application was not part and parcel of the sales transaction. First, Ashleigh points to the section in the Sales Contract providing: "Except as expressly set forth in this contract, a separate writing, or provided by law, Seller makes no other express warranties." Although we agree with Ashleigh that this provision did not "represent that the builder *actually made* an express warranty in a separate writing," it nevertheless contemplated that such a warranty could be issued. The fact that the Emmetts were presented with an application for such an express warranty as part of their closing

28

documents suggests that the parties intended to treat the Warranty Application and the Sales Contract as being part and parcel of the same transaction, i.e., as a unified instrument.

The dissent appears to believe that the two documents cannot be construed together as a unified instrument because the Sales Contract did not incorporate by reference either the Warranty Application or the Centricity Warranty into the contract. But this argument conflates two concepts.[13] A document, even an unsigned one, may be incorporated by reference into a contract when the parties "plainly refer to the other document" in a contract. *St. David's Healthcare P'ship, LP v. Fuller*, 627 S.W.3d 707, 712 (Tex. App.—Austin 2021, pet. dism'd) (citing *In re 24R, Inc.*, 324 S.W.3d 564, 567 (Tex. 2010) (orig. proceeding)); *see also In re Prudential Ins. Co. of Am.*, 148 S.W.3d 124, 135 (Tex. 2004) (orig. proceeding) (holding that lease's jury waiver was incorporated by reference into guaranty agreement, which "plainly refer[red]" to the lease when guarantors agreed to "faithfully perform and fulfill all of [the] terms, covenants, conditions, provisions, and agreements" of the lease if the partnership defaulted).

However, as explained above, the Texas Supreme Court has repeatedly stated that under a unified instrument theory, no such express reference is required. *See In re Laibe Corp.*, 307 S.W.3d at 317 (citing *Fort Worth Indep. Sch. Dist.*, 22 S.W.3d at 840; *Rieder*, 603 S.W.3d at 94 ("instruments pertaining to the same transaction may be read together to ascertain the parties' intent, even if the parties executed the instruments at different times and the instruments do not

---

[13] The dissent relies on *Owen v. Hendricks*, 433 S.W.2d 164, 166 (Tex. 1968) for the proposition that the unified instrument doctrine is merely an "extension" of the doctrine of incorporation by reference. But the court in *Owen* only examined the doctrine of incorporation by reference and did not address the unified instrument doctrine. *Owen*, 433 S.W.2d at 166. Moreover, the dissent criticizes our reliance on several cases that it contends depended on the doctrine of incorporation by reference in concluding that two separate documents could be construed together as a single, unified document; in all of those cases, the courts expressly held that two documents could be viewed as a single, unified instrument, depending on the parties' intent, even when the two documents do not expressly refer to each other. *See, e.g.*, *Stevenson v. Roberts*, No. 14-20-00075-CV, 2021 WL 2460577, at *3 (Tex. App.—Houston [14th Dist.] June 17, 2021, no pet.) (mem. op.); *Christerson v. Speer*, No. 01-16-00469-CV, 2017 WL 1520449, at *5 (Tex. App.—Houston [1st Dist.] Apr. 27, 2017, pet. denied) (mem. op.); *Famous Water Co., L.P. v. Aquio Sols. Intermediate Holdings, LLC*, No. 02-23-00329-CV, 2024 WL 2971686, at *10–11 (Tex. App.—Fort Worth June 13, 2024, no pet.).

expressly refer to each other"); *Copano Energy, LLC v. Bujnoch*, 593 S.W.3d 721, 727 (Tex. 2020) ("multiple writings may comprise a contract even if the parties executed the instruments at different times and the instruments do not expressly refer to each other") (internal quotation marks omitted).

The court has further recognized that in determining whether two documents were intended to be treated as a single, unified instrument, a court may review the "language of both agreements and the facts and circumstances surrounding their execution." *Rieder*, 603 S.W.3d at 95. The dissent, however, contends we are prohibited from considering "parol evidence" to discern the parties' intent, and we must focus solely on the language set forth in the Sales Contract itself. But "[t]he [parol evidence] rule does not prohibit consideration of surrounding circumstances that inform, rather than vary from or contradict, the contract text." *See Houston Expl. Co. v. Wellington Underwriting Agencies, Ltd.*, 352 S.W.3d 462, 469 (Tex. 2011); *see also Kachina Pipeline Co., Inc. v. Lillis*, 471 S.W.3d 445, 450 (Tex. 2015) (court "may consider the facts and circumstances surrounding a contract, including "the commercial or other setting in which the contract was negotiated and other objectively determinable factors that give context to the parties' transaction"); *Carrizo Oil & Gas, Inc. v. Barrow-Shaver Res. Co.*, 516 S.W.3d 89, 96 (Tex. App.—Tyler 2017), aff'd on other grounds, 590 S.W.3d 471 (Tex. 2019) (recognizing that "evidence the [parties'] negotiations and preliminary drafts of [their] agreement was not barred from admissibility by the parol evidence rule"). The dissent also relies on *Southerland v. Ne. Datsun, Inc.*, 659 S.W.2d 889, 891–92 (Tex. App.—El Paso 1983, no writ) for the proposition that a party may not introduce parol evidence of a warranty agreement that was not contained in the parties' sales agreement. But in that case, the parties' agreement provided that no warranties existed unless they were in writing, and contrary to the express terms of the contract, the plaintiff sought to introduce evidence of an

*oral* agreement. *Id.* at 892. We therefore held that such parol evidence was not admissible to vary the contract's express terms. *Id.* Here, however, we are not faced with an oral agreement that would have been prohibited by the Sales Contract. Instead, we are tasked with determining whether the written Warranty Application, which was contemplated by the Sales Contract, can be considered part of a single, unified instrument. Therefore, contrary to the dissent's concerns, we are not varying any terms of the Sales Contract by examining whether the parties intended for the Warranty to be considered along with the Sales Contract as part of a unified instrument.

Accordingly, in considering the emails between the parties' real estate agents regarding the Warranty Application prior to the sale, the fact that the Sale Contract expressly contemplated the possibility that the parties could enter into an express warranty, and the fact that the Warranty Application was presented to the parties at closing along with all other pertinent documents pertaining to the sale, we conclude that the parties intended for the Sales Contract and the Warranty Application to be read together as a single, unified instrument.

### C. The effect of the merger clause

For similar reasons, we disagree with Ashleigh and the dissent that the Sales Contract's merger clause prevents us from treating the two documents as a unified instrument. The merger clause states that "[t]his contract contains the entire agreement of the parties and cannot be changed except by their written agreement." The merger clause then lists three "addenda" considered part of the contract, including a third-party financing addendum, an addendum giving the Emmetts the right to cancel the contract upon receiving the lender's appraisal, and the notice of the parties' intermediary real estate agreement. According to Ashleigh, because neither the Warranty Application or the Warranty were listed as addenda, the parties did not contemplate treating the Warranty Application as part of the Sales Contract. We disagree.

31

We recognize that in some instances, including a merger clause in a contract may warrant a finding that the parties did not intend for two separate documents to be read together, such as when the documents involve and bind different parties, contain entirely separate and distinct rights and obligations, and "make no reference to each other whatsoever." *See Rieder*, 603 S.W.3d at 95. Here, however, BNI and the Emmetts were the only two parties named in both the Sales Contract and the Warranty Application, and both documents relate to the same transaction, i.e., the rights and obligations of the parties to the sale of the home. The Sales Contract contemplates that a builders warranty may be issued in a separate agreement, and the Warranty Application makes multiple direct references to the parties' Sales Contract. The Warranty Application begins by providing that "[t]his application is to enroll your new home" in Centricity's Warranty program, identifying BNI as the "builder," and the Emmetts as the "homeowners" at the address of the home they were purchasing. It then lists the closing date as May 17, 2021; lists the closing contract price as $3,800,000; and indicates that the sale was financed. The Warranty Application states that "certain items and events are not covered by this warranty" and that the homeowners "understand that the Warranty Limit, the maximum aggregate total amount Centricity is liable for under the warranty for all claims may be less than the Closing Contract Price of the Home." In other words, the terms of the Warranty Application are inextricably intertwined with the Sales Contract, and the two documents were not intended to function separately from each other; in fact, the Warranty Application has no independent existence or meaning outside the context of the sale of the home and the contract therefor.[14] *See generally Stevenson v. Roberts*, No. 14-20-00075-CV, 2021 WL

---

[14] Both Ashleigh and the dissent also point to language in the Centricity Warranty that they contend render it a separate document which cannot be considered part of the Sales Contract, noting it contains provisions stating the Warranty is "independent" of any other agreements between the homeowners and the builder, at least for purposes of applying the dispute resolution provisions in the Warranty, and "the Warranty Confirmation(s), any Warranty Amendment(s), Your Warranty Coverage Application, and the Warranty Document form Your entire Warranty Contract." But the question of whether the Centricity Warranty is considered a separate document from the Sales Contract does not affect our analysis of whether the parties intended for the Warranty Application and the Sales Contract to be read together as

2460577, at *3 (Tex. App.—Houston [14th Dist.] June 17, 2021, no pet.) (mem. op.) (concluding that addendum and independent contractor agreement were not intended to function separately, despite merger clauses in both documents, where they related to same subject, had same purpose of setting forth the terms of the plaintiff's employment, were executed by same parties, and addendum contained references to the independent contractor agreement). Because Ashleigh was a party to the Sales Contract, we conclude that she can be considered a party to the Warranty Application as well.[15]

### D. What is the effect of Ashleigh's failure to sign the Warranty Application?

As a preliminary matter, we note that the Centricity Warranty itself did not call for any signatures, and instead only required as a condition of its existence that Centricity approve the Emmetts' application and send the Warranty documents to the Emmetts, giving them the right to cancel the warranty within 30 days of receipt. Therefore, the only question is whether Ashleigh can be bound by the terms of the Centricity Warranty despite her failure to sign the Warranty Application.

In answering this question, we recognize the general principle that a contract can still be effective if signed by only one party. *See, e.g.*, *DeClaire v. G & B McIntosh Family Ltd. P'ship*, 260 S.W.3d 34, 44 (Tex. App.—Houston [1st Dist.] 2008, no pet.) (citing *Velasquez v. Schuehle*, 562 S.W.2d 1, 3 (Tex. App.—San Antonio 1977, no writ). Thus, while a party's signature is "strong evidence" that the party unconditionally assented to the terms of a contract, in the absence of a

---

part of a unified instrument. The salient question is whether the Warranty Application—which was given to the Emmetts at closing and had no independent existence outside the context of the sale itself—must be considered part of the same unified instrument as the Sales Contract, which could bind both Emmetts to the Warranty in the absence of a timely disclaimer.

[15] We do not base this conclusion on any notion that spouses automatically bind each other as agents. Instead, our holding is based on the fact that Ashleigh is undisputedly a party to the Sales Contract, and because we view the Warranty Application as being part and parcel of the Sales Contract, she can be considered a party to the Warranty Application as well.

signature, a court may look to other evidence to establish the party's assent to an agreement. *In re Bunzl USA, Inc.*, 155 S.W.3d 202, 209 (Tex. App.—El Paso 2004, orig. proceeding). In particular, the Texas Supreme Court has recognized that the Federal Arbitration Act—which the parties agree governs the Centricity Warranty—does not require that an arbitration agreement be signed, so long as the agreement is written and agreed to by the parties. *In re AdvancePCS Health L.P.*, 172 S.W.3d 603, 606 (Tex. 2005) (orig. proceeding) (citing 9 U.S.C.A. § 3)); *see also In re Citgo Petroleum Corp.*, 248 S.W.3d 769, 774 (Tex. App.—Beaumont 2008, orig. proceeding) (recognizing same); *In re Bunzl*, 155 S.W.3d at 210 (recognizing that Texas law is in accord with the FAA, which requires an arbitration agreement to be written, but does not expressly require the agreement to be signed by the parties) (citing *Valero Ref., Inc. v. M/T Lauberhorn*, 813 F.2d 60, 64 (5th Cir. 1987) (recognizing that "a party may be bound by an agreement to arbitrate even in the absence of his signature . . . [and][o]rdinary contract principles determine who is bound by a written arbitration agreement")).

As a matter of ordinary contract interpretation, if one party signs a contract and the other does not, the other party may accept the contract by "his acts, conduct, or acquiescence in the terms of the contract." *DeClaire*, 260 S.W.3d at 44 (collecting cases). If the party's acceptance is demonstrated by its conduct, the contract becomes a "binding agreement on both parties." *Jones v. Citibank (S. Dakota), N.A.*, 235 S.W.3d 333, 338 (Tex. App.—Fort Worth 2007, no pet.) ("Under Texas law, if one party signs a contract, the other may accept by her acts, conduct, or acquiescence to the terms of the contract, making it a binding agreement on both parties.") (collecting cases); *see also Chubb Lloyds Ins. Co. of Texas v. Buster & Cogdell Builders, LLC*, 668 S.W.3d 145, 151 (Tex. App.—Houston [1st Dist.] 2023, no pet.) (recognizing that when the parties demonstrate their mutual assent to a contract, they are bound by its terms). Whether mutual assent exists is

usually a question of fact. *Chubb Lloyds Ins. Co. of Texas*, 668 S.W.3d at 151 (citing *Foreca, S.A., v. GRD Dev. Co.*, 758 S.W.2d 744, 745–46 (Tex. 1988) (whether parties intended to execute binding contract is often a question for the factfinder)). But in some instances, the existence of mutual assent becomes a question of law. *Id*. at 151–152 (citing *Foreca*, *S.A.*, 758 S.W.2d at 746).

Here, although neither BNI nor Ashleigh signed the Warranty Application or the Centricity Warranty itself, the record reflects as a matter of law that their conduct demonstrated they both assented to the terms of the Warranty. First, BNI demonstrated its assent by ensuring that the Warranty Application was given to the Emmetts at closing and paying the requisite fee to have the Warranty issued. *In re Bunzl*, 155 S.W.3d at 210–11 (recognizing that a party can demonstrate its assent to an agreement by ensuring that the agreement's obligations are enforced). As well, in his affidavit, Jeffrey Mills averred that he had informed the Emmetts' real estate agent that he was furnishing a builders warranty on the property, as reflected in the email exchanges between the various agents prior to the sale. The record also contains an email from Mary Mills to the closing agent at the title company informing them of the need to present the Warranty Application to the Emmetts at the closing. Accordingly, all of the evidence points to a conclusion that BNI demonstrated its assent to the Warranty.

Ashleigh, however, contends she did not engage in any conduct demonstrating her assent to the Warranty terms, and instead she "disavowed" or "disclaimed" it as soon as she learned of its existence in September 2022.[16] But this overlooks the actions her attorney took—or did not take—in the interim on the Emmetts' behalf with respect to their dispute with BNI.

As set forth above, the record reflects that the Emmetts retained Merica to represent them in their dispute with BNI as early as January 2022, and that she began corresponding with the

---

[16] According to her affidavit, Ashleigh did not see either the Warranty Application or the Warranty itself until the two documents were attached to correspondence that her attorney received from Jeffrey Mills in September 2022.

35

Millses at that time, asserting she had the authority to act on their behalf. It is undisputed that on February 7, 2022, Daniel and Ashleigh's attorney asked Jeffrey Mills for a copy of the builders warranty that her clients had been "promised" and that she received a copy of the Centricity Warranty on February 9, 2022. Despite admittedly receiving the Warranty, neither Merica nor the Emmetts disclaimed it for over six months, disregarding the Centricity Warranty's clear notice that the cancellation could be effected by "return[ing] the Warranty for cancellation within 30 days of [their] receipt of it." Even if we were to impute the latest admitted date Ashleigh received the Warranty documents—February 2022—neither she, Daniel, nor their attorney made any attempt to cancel or otherwise disavow the Warranty within the 30-day cancellation period.

Instead, after having received a copy of the Warranty documents in February 2022, and with full knowledge of the Warranty's terms binding the Emmetts to the express warranties set forth in the policy, Merica, acting on behalf of both Emmetts, made continuing demands on BNI to address the issues on the home, including the demand made in the May 2022 Notice she sent to BNI detailing "items of defective construction that have become evident *in the Emmett's one year warranty period*" (emphasis added). As BNI points out, the Warranty carries a one-year warranty period for defects in workmanship and materials, which comports with many of the items in Merica's May 2022 list of demanded repairs.[17]

At the hearing on BNI's motion to compel, Merica asserted she was not referring to that one-year warranty period in her May 2022 Notice, but instead to the "statute of limitations," contending Ashleigh's claims have always been made under the "implied warranty of good and workmanlike conduct" and all of them arose in the first year of her homeownership. However, as

---

[17] The items included complaints about the pool gunite, a water leak at the front door, a dislodged sprinkler cover, a broken stair rail, a waterfall that was not working in the hot tub, crumbling stepping stones on a walkway, a crack in the walkway to the hot tub, broken tiles in the hot tub, a misaligned shower door, and a patio door that would not lock.

BNI points out, this argument carries little, if any weight, as a claim for the breach of the implied warranty of workmanlike construction is subject to the same *four-year* statute of limitations that governs claims for breach of contract, as an implied warranty only exists by virtue of the contract from which it emanates. *See Nghiem v. Sajib*, 567 S.W.3d 718, 724–25 (Tex. 2019); *see also Beltway Park Baptist Church, Inc. v. Bolton*, No. 11-18-00049-CV, 2020 WL 868069, at *2 (Tex. App.—Eastland Feb. 21, 2020, no pet.) (mem. op.) (recognizing that "[a] claim for breach of the implied warranty of good and workmanlike manner, when not alleged as a violation of the DTPA, may be subject to a four-year statute of limitation.

But regardless of whether Merica intended to refer to the Warranty in her May 2022 Notice, the record contains other undisputed evidence that she assented to the Warranty on behalf of the Emmetts prior to Ashleigh's attempt to disclaim it months later. Merica continued to make demands for repairs on the subject property that was covered by the Warranty's express terms for months before she wrote to Jeffrey Mills in September 2022 stating she believed Ashleigh was not bound by the Warranty.[18] According to Jeffrey Mills's uncontroverted affidavit, Merica continued to "request repairs and other minor work during the one-year warranty period, which BNI continued to address" until that time. And Ashleigh did not provide any evidence in the record to suggest that Merica did not have the authority to act on her behalf during that time, or that Merica

---

[18] The dissent cites *In re Weekley Homes, L.P.*, 180 S.W.3d 127, 133 (Tex. 2005) for "the proposition that homeowners are not bound to arbitrate under an express warranty merely by seeking repairs." According to the dissent, "[t]he [Supreme] Court expressly rejected the notion that either requesting or receiving repairs covered by a warranty sufficed to demonstrate assent." The dissent further contends that *Weekley* required "more explicit affirmative conduct tied to the warranty—claiming the authority of the contract and demanding compliance with the provisions of the contract" in order to be bound by its terms. *Id.* at 133 (internal quotation marks omitted). But in *Weekley*, the issue was whether the plaintiff was bound by an arbitration provision in a sales agreement she did not sign, and the court held that she could not be bound merely because she resided in the home. *Id.* at 133. Nevertheless, the court held that she could be bound because she engaged in certain actions under the "authority" of the sales agreement, such as directing some of the construction features in the house, repeatedly demanding repairs to the home, and personally requesting and receiving financial repairs. *Id.* However, the court did not make these factors a "requirement" in every case, nor did it say that seeking repairs under an express warranty would not be sufficient to bind the homeowner to the warranty.

took any actions outside the scope of her authority.[19] *See generally Breceda v. Whi*, 187 S.W.3d 148, 152 (Tex. App.—El Paso 2006, no pet.) (recognizing that "[t]he attorney-client relationship is one of agent and principal," and therefore, "the acts of the former ordinarily binds the latter") (citing *Texas Emp. Ins. v. Wermske*, 349 S.W.2d 90, 93 (Tex. 1961); *American Home Assur. Co. v. Rodriguez*, 749 S.W.2d 897, 899 (Tex. App.—San Antonio 1988, no writ)).

Finally, contrary to the dissent's position, we do not suggest that an attorney has the "implied authority to submit a case to arbitration" or that an attorney may do so without her client's consent. *See, e.g.*, *U.S. ex rel. Goldsby v. Harpole,* 263 F.2d 71, 83 (5th Cir. 1959). Instead, our holding is simply that, under these unique circumstances, Merica, who was hired to represent Ashleigh in a warranty dispute, engaged in actions between February and September 2022 that demonstrated Ashleigh's assent agreement to be bound by the terms of the Warranty—which included an arbitration agreement—well before she took any steps to disclaim it months later on her clients' behalf.

Accordingly, we conclude that Ashleigh assented to and was bound by the arbitration agreement in the Centricity Warranty. BNI's Issue One is sustained.[20]

---

[19] The dissent cites *Chavez v. Kansas City S. Ry. Co.*, 520 S.W.3d 898, 900–01 (Tex. 2017) for the proposition that "just because a party hires an attorney to make demands does not indicate authority to compromise her substantial rights." We agree that there are limits to an attorney's authority depending on the facts of the case. In *Chavez*, the court held that there was a presumption that an attorney possessed the authority to act on her client's behalf in entering into a settlement agreement, but that the "presumption may be rebutted with evidence to the contrary" *Id.* at 900. Here, the record undisputedly demonstrates that Merica was hired to represent the Emmetts with respect to their dispute with BNI, and there is nothing in the record to suggest that she did not have the authority to take any of the actions that she did. Nor does the record reflect that Ashleigh sought a hearing on this issue in the trial court.

[20] In light of our resolution of Issue One, we need not address BNI's other three issues in which it asserts other grounds for concluding that Ashleigh is bound to the arbitration agreement in the Warranty as a nonsignatory.

# VI. WHETHER ASHLEIGH'S CLAIMS ARE WITHIN THE SCOPE OF THE ARBITRATION

BNI next addresses the argument Ashleigh made in the trial court that her claims were not subject to arbitration as a basis for denying BNI's motion to compel arbitration. Upon addressing this question, we conclude that the trial court could not have denied the motion on this basis, as the arbitration agreement called for the arbitrator, not the court, to decide the issue of arbitrability.

## A. Applicable law

As explained above, a party seeking to compel arbitration of the opposing party's claims must establish not only that there is a valid and binding arbitration agreement, but that the claims raised fall "within the scope of the agreement." *Sotero*, 642 S.W.3d at 585–86. However, it is well-established that the parties to a contract can agree that the arbitrators, rather than the courts, must resolve disputes over the validity and scope of their arbitration agreements, i.e., they may delegate authority to resolve arbitrability disputes to the arbitrator. *TotalEnergies E&P USA, Inc. v. MP Gulf of Mexico, LLC*, 667 S.W.3d 694, 702 (Tex. 2023) (citing *Jody James Farms*, 547 S.W.3d at 631).

"If the parties have contractually agreed to delegate arbitrability disputes to the arbitrator, courts must enforce that agreement just as they must enforce an agreement to delegate resolution of the underlying merits to the arbitrator." *Id.* (citing *RSL Funding*, 569 S.W.3d at 120). "For the most part, the determination of whether parties have agreed to delegate arbitrability to an arbitrator is governed by 'ordinary state-law principles that govern the formation of contracts.'" *Id.* But a court will only enforce an agreement to delegate arbitrability to the arbitrator if that agreement is "clear and unmistakable." *Id.* (citing *Robinson*, 590 S.W.3d at 525, 532).

## B. Analysis

In its brief, BNI maintains that the Warranty clearly and unmistakably delegated arbitrability to the arbitrator. It notes the Warranty's provision that if the parties cannot resolve a dispute through the informal dispute resolution processes, they agree that any dispute—including "any dispute over the scope of this Arbitration Provision"—will be submitted to binding arbitration. Ashleigh does not disagree. Instead, she contends (1) BNI waived its right to argue in favor of such a delegation by arguing the issue of scope in the trial court, and (2) even though all of her other claims come within the scope of the arbitration agreement, she nevertheless has a right to have the trial court resolve her request for a declaratory judgment.

### (1) Whether BNI waived its right to contend that the parties delegated arbitrability issues to the arbitrator

Ashleigh contends BNI waived its right to maintain that the arbitration agreement delegated arbitrability to the arbitrator, as BNI did not make this same argument in the trial court, and instead affirmatively argued Ashleigh's claims did come within the arbitration agreement's scope. According to Ashleigh, because BNI "argued the scope issue to the district court and asked that court to rule upon it. . . . BNI clearly demonstrated its intent to abandon or waive any right it had to have an arbitrator decide any dispute over the scope of the arbitration provision."

In making this argument, Ashleigh relies solely on the Texas Supreme Court's holding in *LaLonde v. Gosnell*, 593 S.W.3d 212, 219 n.19 (Tex. 2019). We find this case unhelpful to her position. In *LaLonde*, the plaintiffs sued a licensed professional engineer and his engineering companies and consulting groups for breach of contract and negligence in addressing foundational issues with their home without complying with the statutory requirement "to contemporaneously file an affidavit from a similarly licensed professional attesting to the lawsuit's merits[.]" *LaLonde*, 593 S.W.3d at 216. Although the failure to file such an affidavit required dismissal of the lawsuit,

40

the engineers did not seek dismissal of the lawsuit on that basis until the eve of trial, over a thousand days after the lawsuit was filed and after both parties had engaged in substantial discovery and pretrial proceedings. *Id*. In response, the plaintiffs maintained that the engineers had waived their right to argue for dismissal on this basis, given their conduct in engaging in the judicial process. *Id.* In agreeing with the plaintiffs, the Texas Supreme Court observed "[w]aiver is the 'intentional relinquishment of a known right or intentional conduct inconsistent with claiming that right,'" and to demonstrate an "implied waiver by litigation conduct," the party's conduct, whether through "action or inaction," must "clearly demonstrate[] the party's intent to relinquish, abandon, or waive the right at issue—whether the right originates in a contract, statute, or the constitution."[21] *Id.* at 218–220. After applying a totality of the circumstances test, the court concluded that "the defendant engineers' engagement of the judicial process implies they intended to waive the statute's requirements." *Id*. at 216, 227–228 (citing *Perry Homes v. Cull*, 258 S.W.3d 580, 596 (Tex. 2008) (concluding plaintiffs waived their right to compel arbitration by their conduct where they actively opposed arbitration, conducted extensive discovery, and waited until the eve of trial, 14 months after filing suit). The court recognized that due to the defendants' failure to assert their right to dismissal until after the statute of limitations had expired on the plaintiffs' contract claims, the defendants had been "sitting on their rights" and their delay in filing their motion clearly prejudiced the plaintiffs. *Id*. at 229.

Here, however, BNI did not substantially invoke the judicial process prior to asserting its right to seek arbitration of Ashleigh's claims. To the contrary, as BNI points out, it quickly moved to compel arbitration after filing its answer to Ashleigh's petition (which also raised the affirmative defense that her claims were subject to arbitration) without engaging in any other pretrial

---

[21] The court noted that, in contrast, the question of whether a party is estopped from raising a right based on his conduct "focuses on detriment or prejudice to the other party." *LaLonde v. Gosnell*, 593 S.W.3d 212, 219 (Tex. 2019).

proceedings. Moreover, although BNI did not expressly argue in the trial court that arbitrability was to be decided by the arbitrator, we cannot say that it waived its right to address this issue on appeal by its conduct in the trial court. In the trial court, neither party addressed the question of which entity—the arbitrator or the court—was to decide arbitrability. BNI did not argue that the arbitrator was precluded from determining arbitrability. Instead, in the trial court, BNI's sole focus was to establish its right to compel arbitration of Ashleigh's claims, and BNI never wavered from its ultimate goal of establishing that Ashleigh's claims were subject to arbitration. *See Eagle Oil & Gas Co. v. TRO-X, L.P.*, 619 S.W.3d 699, 709 (Tex. 2021) (where party did not make unequivocal statements relinquishing its rights to receive equitable title of property and where party's actions were at all times "consistent with 'its ultimate goal' of being made whole," court would not find that party intentionally waived the right to make that argument on appeal).

Moreover, on appeal, the ultimate issue before us is whether the trial court erred in denying BNI's motion to compel arbitration, i.e., whether the arbitration agreement was valid and enforceable against Ashleigh, and whether Ashleigh's claims were subject to the agreement, both of which we decide as a matter of law. *In re Labatt Food Serv., L.P.*, 279 S.W.3d at 643. Although BNI may be bringing a "new argument" regarding why the trial court erred in denying its motion to compel arbitration, the issue remains the same, and we will therefore consider the argument in our analysis. *See Office of Risk Mgmt. v. Martinez*, 539 S.W.3d 266, 273 (Tex. 2017) (recognizing that "parties are free to construct new arguments" on appeal in support of "unwaived issues properly before the court").

We have already concluded that the arbitration agreement was valid and enforceable against Ashleigh, and we acknowledge that the arbitration agreement expressly delegates arbitrability to the arbitrator. We therefore conclude that the trial court could not have denied BNI's

motion to compel arbitration based on a finding that Ashleigh's claims do not come within the scope of the agreement, as that issue was for the arbitrator to decide. Accordingly, we refrain from opining on whether Ashleigh's claims are in fact arbitrable, leaving it to the arbitrator to make that determination. *See TotalEnergies*, 667 S.W.3d at 721 (having found that the parties delegated arbitrability disputes to the arbitrator, the court would not express any opinion on the merits of the parties' controversy or on whether the arbitrator or the courts must resolve them).

### (2) Ashleigh's request that we remand her declaratory judgment claim to the trial court

Finally, Ashleigh argues that regardless of whether the arbitration agreement delegated arbitrability to the arbitrator, we should conclude that her request for declaratory judgment does not fall within that delegation. Instead, she posits that the request must be resolved by the trial court in the first instance. According to Ashleigh, we should treat her request for a declaratory judgment as raising the gateway issue of whether "the Centricity [W]arranty binds [her] *at all.*" She relies on the Texas Supreme Court's holding in *Sotero* for the proposition that, "as a matter of law," this issue is "a question for the courts," rather than the arbitrator. Ashleigh therefore requests that if we reverse the trial court's decision denying BNI's motion to compel arbitration, we remand to the trial court to allow it to resolve this issue in the first instance. We find no basis for doing so.

In *Sotero*, the court held that in resolving a motion to compel an arbitration agreement in a contract, the question of whether a valid contract ever came into existence is a question of law for the court to resolve. *Sotero*, 642 S.W.3d at 586. And we have already resolved that question. We have also resolved the question of whether Ashleigh can be bound to the arbitration agreement, despite her status as a nonsignatory to the contract, as a question of law for the court to decide. *See Transcor Astra Group S.A. v. Petrobras Am. Inc.*, 650 S.W.3d 462, 480 (Tex. 2022) (recognizing that the question of "whether the parties made a valid *and presently enforceable* agreement to

43

arbitrate . . . is for the courts to decide") (emphasis in the original) (internal quotation marks omitted).

But Ashleigh's request for a declaratory judgment goes beyond requesting a ruling on those two issues, seeking a broad declaration that she did not "waive any implied warranties" with respect to the construction and that "she is not subject to the limitations of the Centricity Warranty." In effect, her request seeks a ruling that she is not bound by the terms of the Warranty and that she may pursue her common law claims in a court of law. The question of whether she waived her right to bring those claims is inherently one of scope—a question that we have determined is for the arbitrator to decide.

"[A]rbitrability turns on the substance of a claim, not artful pleading." *See In re Merrill Lynch Tr. Co. FSB*, 235 S.W.3d 185, 190 (Tex. 2007) (orig. proceeding). Therefore, "parties to an arbitration agreement may not evade arbitration through artful pleading . . . ." *Id.* at 188, 190 (holding that where the plaintiffs' claims against a Merrill Lynch employee were, in substance, claims against Merrill Lynch, they were required to arbitrate in accordance with the contract with Merrill Lynch; they could not rely on "artful pleading" to avoid arbitration). In particular, a party may not bring a claim under the Uniform Declaratory Judgment Act as a means of avoiding arbitration. *See Craddick Partners, Ltd. v. EnerSciences Holdings, LLC*, No. 11-15-00014-CV, 2016 WL 3920024, at *2 (Tex. App.—Eastland July 14, 2016, no pet.) (mem. op.) (concluding that the plaintiff's request for a declaratory judgment declaring that a sales agreement between the parties had terminated was "an artfully pleaded breach of contract claim" subject to the parties' arbitration agreement).

Here, Ashleigh attempts to avoid submitting her common law claims to arbitration by seeking a judicial determination that she did not waive those claims and that she may bring them

in a judicial proceeding. That very request asks the trial court to resolve one of the most fundamental disputes: whether her claims are subject to arbitration. Having found that the arbitrator must decide arbitrability, we find no basis for treating her claim for declaratory relief any differently than her other common law claims in this regard. We therefore reject Ashleigh's request to remand for the trial court to consider her claim for declaratory relief separately.

## VII. WHETHER ASHLEIGH IS ENTITLED TO REMAND FOR AN EVIDENTIARY HEARING

In her brief, Ashleigh contends for the first time that unresolved factual disputes require an evidentiary hearing, and she asks that we remand to the trial court for that purpose. According to Ashleigh, she was entitled to an evidentiary hearing on the question of whether a valid contract was formed and whether she was bound by the arbitration agreement in the Warranty.

Aside from the fact that Ashleigh never requested such a hearing in the trial court, we find no basis for granting her request at this time. Evidentiary hearings are rarely required to resolve a motion to compel arbitration. *Jack B. Anglin Co*, 842 S.W.2d at 269. The legislature has "mandated that a motion to compel arbitration be decided summarily," as "the main benefits of arbitration lie in expedited and less expensive disposition of a dispute[.]" *Id.* Therefore, a "trial court may summarily decide whether to compel arbitration on the basis of affidavits, pleadings, discovery, and stipulations." *Id*. However, "if the material facts necessary to determine the issue [of whether to compel arbitration] are controverted, by an opposing affidavit or otherwise admissible evidence, the trial court must conduct an evidentiary hearing to determine the disputed material facts." *Id*.; *see also In re Poly-Am., L.P.*, 262 S.W.3d 337, 354 (Tex. 2008) (orig. proceeding) (recognizing same).

Ashleigh has not pointed to any disputed material facts in the parties' opposing affidavits preventing us from determining whether a valid contract was formed or whether she was bound to

the arbitration agreement despite being a nonsignatory. To the contrary, we have resolved both issues as a matter of law based on the undisputed evidence that (1) Ashleigh's husband signed the Warranty application at closing; (2) Centricity issued the Warranty in May 2021; (3) the Emmetts received the Warranty in February 2022, if not June 2021, and made no attempt to cancel it within the 30-day cancellation period; and (4) the Emmetts sought benefits under the Warranty by continuing to make demands for home repairs for the next several months without attempting to disavow the Warranty until September 2022. Ashleigh has not explained where the dispute lies that would have prohibited us from resolving these two issues on the evidence before us. We therefore deny Ashleigh's request to remand to the trial court for an evidentiary hearing. *See In re Poly-Am., L.P.*, 262 S.W.3d at 354 (rejecting plaintiff's request for an evidentiary hearing on the defendant's motion to compel arbitration where the parties' affidavits were not in conflict on any issue relevant to the motion).

## VIII. CONCLUSION

We reverse the trial court's order denying the motion to compel arbitration and remand to the trial court with directions to submit Ashleigh's claims to arbitration in accordance with the arbitration provisions in the Warranty.

LISA J. SOTO, Justice

August 29, 2025

Before Salas Mendoza, C.J., Palafox and Soto, JJ.
Palafox, J., dissenting

46